IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 20, 2005 Session

## STATE OF TENNESSEE v. LOUISE DAWSON MARLOW

**Direct Appeal from the Circuit Court for Coffee County**
**No. 31,478      L. Craig Johnson, Judge**

_____

**No. M2004-02811-CCA-R3-CD - Filed November 21, 2005**

_____

The defendant, Louise Dawson Marlow, pled nolo contendere to reckless homicide and agreed to a sentence of seven years as a Range II, multiple offender. The trial court sentenced the defendant to one year in confinement followed by six years in community corrections. This Court concluded on direct appeal that the defendant was not eligible for community corrections and remanded for re-sentencing. Upon remand, the trial court re-sentenced the defendant to serve her entire sentence in confinement. The defendant again appeals, arguing that the trial court erred in re-sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Ernest W. Williams (on appeal and at trial) Franklin, Tennessee; John D. Schwalb, (on appeal) Franklin, Tennessee; and Robert T. Carter, Tullahoma, Tennessee (at trial), for the appellant, Louise Dawson Marlow.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; and C. Michael Layne, District Attorney General; and Kenneth Shelton, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

The following factual account is set forth in this Court's opinion on direct appeal:

On February 7, 2000, [the victim] arrived at his home. [The victim] exited his vehicle and headed for his back door. [The co-defendant] stepped out of the laundry room (located on the carport) and shot [the victim] two times. As the victim fell to

the ground, [the co-defendant] fled on foot. The victim's wife, [the defendant], came outside and found the victim laying on the carport in a pool of blood. She ran back inside the home, called 911 and grabbed several towels. When law enforcement officers arrived at the scene they found [the defendant] sitting on the carport with the victim's head in her lap. She was rocking back and forth saying "Why--who did this?"

The victim was taken to the hospital and flown via life flight helicopter to Vanderbilt Hospital where he died from his wounds. Medical reports show that the victim was shot once in the arm with the bullet traveling through the arm and into his torso and once in the head. The ensuing investigation was conducted by the Coffee Co. Sheriff's Dept., the 14th Judicial District Attorney General's Office and the Tennessee Bureau of Investigation. Investigators received a phone call from the sister of [the co-defendant] in July 2001 reporting that he had been bragging about shooting the victim and that he and his wife, Laurie, had disposed of the weapon. Investigators brought [the co-defendant] in for questioning. [The co-defendant] admitted that he had shot the victim and stated that it was done at the request of [the defendant], the victim's wife. [The co-defendant] agreed to wear a wire and talk with [the defendant] about the murder of her husband. [The co-defendant] had taped conversations with [the defendant] on July 12th, 13th, 24th and 30th of 2001. In these conversations, [the defendant] implicated herself in arranging for the murder of her husband.

On the night of the murder, [the co-defendant] went to the home where [the defendant] gave him a Smith and Wesson .38 Special (the property of the victim) and concealed him in the laundry room. When the victim arrived home, [the co-defendant] stepped out of the laundry room and shot the victim two times. [The co-defendant] fled on foot to his home. [The co-defendant] and his wife, Lauire [sic], would later dispose of this weapon by throwing it in a lake.

The first witnesses to testify at the sentencing hearing were Billy Cook, an investigator for the district attorney's office, and Kendall Barham, an agent with the Tennessee Bureau of Investigation. They communicated with the defendant on numerous occasions throughout the course of the twenty-month investigation into the victim's death. The defendant appeared to be cooperating and even gave the investigators the names of several potential suspects that she thought might have been involved. The co-defendant, Roger Dale Wimley, agreed to cooperate with the authorities in July of 2001. He stated that the defendant called him to the residence on February 5, 2000, gave him a gun, and told him to shoot the victim as he was walking to the door. The co-defendant showed the police the location of the weapon used in the shooting. He also agreed to wear a recording device and engage the defendant in conversation about the victim's death. Transcripts of the four recorded conversations were entered into evidence at the sentencing hearing. The transcripts

of the recorded conversations revealed several incriminating statements made by the defendant. Apparently referring to the shooting of the victim, the defendant stated on July 12 that she was "not a bit sorry about that. Not when I get to sleep at night." On July 13, the following exchanges occurred between the defendant and co-defendant:

> [Co-defendant]: You know, you know I killed [the victim] for you?
> [Defendant]: A good thing.
> . . . .
> [Co-defendant]: I'll hide. I just . . .
> [Defendant]: That's the wrong thing to do is run. That's the wrong thing to do. You run, they're going to know you killed him. I didn't see nothing and I don't know nothing. I've done told them and they've never associated you with it. It's all in your head. You run and you're going to look bad.
> . . . .
> [Defendant]: Honey, nobody's watching you. Don't be scared. And if you tell anyone you done that for me, they'll hang me from the highest tree and take everything I got.
> During the July 24 conversation, the defendant and co-defendant made the following statements in discussing the location of the gun used by the co-defendant in the shooting:
> [Co-defendant]: Huh, the one that shot [the victim]?
> [Defendant]: I thought that was in the bottom of the lake.
> [Co-defendant]: I don't know.
> [Defendant]: You all didn't take it there?

Becky Stevens, a daughter of the victim and defendant, testified at the sentencing hearing. She stated that the victim was seventy-six years old at the time of his death. She never witnessed any type of physical abuse by her father. The defendant never indicated to Stevens that she was afraid of the victim. According to Stevens, as a result of the victim's death, the defendant gained control over the family's land and part of their winery. The record indicates that the real estate was valued at almost three million dollars, and the winery was valued at five hundred thousand dollars. Stevens said that she thought the defendant should be required to serve the entire seven-year sentence. The defendant had never admitted to Stevens that she killed the victim. Stevens said that the defendant has always maintained the appearance that she wanted to find out who is responsible.

Julia Henson, another daughter, also testified at the sentencing hearing. She lived with her parents until she was twenty-eight years old. Henson said that she witnessed physical and verbal abuse by the victim toward the defendant on numerous occasions. Several times, the victim wrapped a telephone cord around the defendant's neck and

attempted to choke her. She also recalled an incident where the victim picked up a camping grill and was about to throw it through the windshield of the family car with the defendant inside until Henson intervened. Henson also stated that the victim hit the defendant and knocked her down soon after the defendant's hysterectomy. The defendant had to be hospitalized and have additional surgery on her bladder. Henson testified that the defendant told her that she did not know who killed the victim.

Alicean Marlow, one of the granddaughters of the victim and defendant, testified that she never witnessed any type of abuse by the victim. There was no indication that the defendant was afraid of the victim. The witness stated in her victim impact statement that the defendant "should receive the maximum sentence possible."

The defendant entered into evidence records indicating that the defendant had filed for divorce from the victim in 1982 and again in 1986. The divorce filings alleged abuse by the victim. Both actions were dismissed by the defendant. The defense also introduced a copy of a lawsuit filed by Becky Stevens and her brother against the defendant alleging the wrongful death of the victim. The State agreed to stipulate that the victim was prosecuted sometime in the 1970's for insurance fraud and was found not guilty. The defense also introduced forty-five letters from people in the community expressing their belief in the defendant's innocence and attesting to her good character. The depositions of Doctors Scoville and Spangler were introduced by the defendant. The depositions indicated that the defendant is an insulin-dependent diabetic. She experienced a major stroke in 1998 and suffered three additional stroke events in 2002. In May of 2002, she had one stint placed in a coronary artery to relieve severe blockage, and two more were inserted in July of that year. The defendant remains at "[v]ery, very high risk" for a stroke or heart attack due to a "history of hypertension, hyperlipidemia, [and] diabetes," due to stress.

State v. Louise Dawson Marlow, No. M2003-00082-CCA-R3-CD, 2004 WL 298375 (Tenn. Crim. App., at Nashville, Feb. 17, 2004) *perm. app. denied* (Tenn. Sept. 7, 2004) (hereinafter Marlow I).

After a sentencing hearing, the trial court sentenced the defendant to one year in confinement followed by six years in community corrections. In making its sentencing determination, the trial court discussed both the enhancement and mitigating evidence presented and then made the following statements:

After having considered the evidence received at the plea and sentencing hearing, the pre-sentence report, the principles of sentencing, arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, and the potential or lack of potential for rehabilitation or treatment, the [c]ourt must *deny* the defendant's request for probation. In the alternative, the [c]ourt has carefully considered alternative sentencing principles pursuant to TCA 40-35-102 and find that

-4-

the defendant qualifies for the following: The [c]ourt finds that a split confinement sentence would be particularly suited in the present case. . . .

On appeal, this Court concluded that the defendant was not eligible for community corrections and remanded for re-sentencing. Upon remand, both the State and the defendant stipulated that the trial court could re-sentence the defendant without further evidentiary proof. The trial court re-sentenced the defendant to serve her entire sentence in confinement. The trial court stated the following:

> To redetermine the punishment in this cause, the [c]ourt has carefully considered the evidence, the entire record, and all the factors listed at T.C.A. § 400-35-101 et seq [sic]. The defendant has previously agreed, as a part of her agreement with the State, to a sentence of seven (7) years, as a Range II, Multiple Offender. The Court of Criminal Appeals has stated that the defendant is a poor candidate for rehabilitation. Based upon the previous findings at the original sentencing hearing and consistent with the opinion of the Criminal Court of Appeals, the [c]ourt finds it necessary for the defendant to serve her previously agreed to sentence in the Tennessee Department of Correction where she will be eligible for parole after the service of twenty-nine (29) months.

## II. Analysis

The defendant again appeals, arguing that the trial court erred in re-sentencing her to full confinement after previously finding that she was eligible for alternative sentencing in the form of a split confinement sentence. Relying on the "law of the case" doctrine, the defendant contends that a split sentence of confinement and probation is appropriate.

As previously stated in Marlow I, appellate review of a challenged sentence is a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the defendant has the burden of showing that the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments.

Generally, considerations relevant to determining a defendant's eligibility for alternative sentencing are relevant to determining suitability for probation. See Ashby, 823 S.W.2d at 169. A defendant is presumed to be a favorable candidate for alternative sentencing if the defendant is an especially mitigated or standard offender convicted of a Class C, D, or E felony and there exists no evidence to the contrary. Tenn. Code Ann. § 40-35-102(6). However, this presumption is unavailable to a defendant who commits the most severe offenses, has a criminal history showing

-5-

clear disregard for the laws and morals of society, and has failed past efforts at rehabilitation. Id. § 40-35-102(5); State v. Fields, 40 S.W.3d 435, 440 (Tenn. 2001). Also, the presumption in favor of alternative sentencing may be overcome by facts contained in the presentence report, evidence presented by the state, the testimony of the accused or a defense witness, or any other source, provided it is made a part of the record. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

A defendant is eligible for probation if the actual sentence imposed is eight years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. See Tenn. Code Ann. § 40-35-303(a). A trial court shall automatically consider probation as a sentencing alternative for eligible defendants. Id. § 40-35-303(b). However, entitlement to probation is not automatic and the defendant still bears the burden of proving suitability for full probation. Id., Sentencing Commission Comments; State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997).

Guidance as to whether the trial court should grant alternative sentencing or incarcerate is found in Tennessee Code Annotated section 40-35-103. Sentences involving confinement should be based upon the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. . . .
>
>              . . . .
> (5) The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. . . .

Tenn. Code Ann. § 40-35-103(1), -(5).

Contrary to the defendant's assertions, it is our view that the trial court did not err in re-sentencing the defendant. To start, the trial court was not precluded from re-sentencing the defendant to full confinement by the doctrine of the law of the case. The doctrine of the law of the case can be explained as follows:

> [A]n appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to dicta. . . .

Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand.

State v. Jefferson, 31 S.W.3d 558, 560-61 (Tenn. 2000) (citations omitted).

As previously indicated, the trial court ordered the defendant to serve one year in confinement followed by six years in community corrections. In Marlow I, the defendant's challenge was to her sentence of confinement. Marlow I, 2004 WL 298375, *1. Upon review of the defendant's initial appeal, this Court first determined that appellate review of the trial court's findings was de novo with a presumption of correctness because the record established that the trial court considered the sentencing principles and all relevant facts and circumstances attendant to the defendant's conviction. Id. at *5. We next determined that the defendant was not entitled to the presumption of favorable candidacy for alternative sentencing because she was sentenced as a multiple offender. Id. In addition, we determined that the record supported the trial court's findings that confinement was necessary to avoid depreciating the seriousness of the offense, and because of a need for deterrence to others likely to commit similar offenses. Id. at *6-7. We further noted that "the defendant's lack of remorse, lack of candor, and untruthfulness" demonstrated poor candidacy for rehabilitation and supported a "denial of probation in this case." Id. at *7. Finally, we concluded that the defendant did not qualify for a community corrections sentence and remanded for re-sentencing. Id.

Notably absent from our holding in Marlow I was a specific determination of the manner of service of the defendant's sentence. Because the doctrine of the law of the case applies to issues decided on appeal, the trial court was not constrained to follow its previous sentence; rather, the trial court was free to re-sentence the defendant after review of the record and applicable law, including our holding on appeal. Significantly, the trial court's findings, affirmed by this Court on appeal, established that a sentence of confinement was appropriate; and reasonably, those same findings preponderated against a sentence favoring probation. We have often held that a trial court's findings regarding (1) the nature and circumstances of the criminal conduct involved, (2) the defendant's rehabilitation potential, (3) the seriousness of the offense, (4) the deterrence value, and (5) the defendant's untruthfulness – carry weight when deciding the defendant's suitability for probation. See e.g., State v. Blackhurst, 70 S.W.3d 88, 97 (Tenn. Crim. App. 2001); see also Tenn. Code Ann. § 40-35-103(1)(B). Upon remand, the trial court stated that it carefully considered the entire record and all the applicable law in making its decision to order the defendant to serve her entire sentence in confinement. Both the record and the applicable law supports the trial court's sentencing decision. Consequently, we affirm the judgment of the trial court.

_____

J.C. McLIN, JUDGE